1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  2:08-cr-00012-PMP-GWF |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER AND** |
| vs. | ) | **FINDINGS AND RECOMMENDATION** |
| | ) | |
| | ) | **Motion to Suppress Evidence -- #20** |
| JUDAH MAY, | ) | **Second Motion to Suppress Evidence** |
| | ) | **-- #52** |
| Defendant. | ) | |
| | ) | |

        This matter is before the Court on Defendant Judah May's Motion to Suppress Evidence (Franks
Hearing Requested to Determine Whether the Application for the Search Warrant Was Misleading)
(#20), filed on May 23, 2008; the Government's Response to Defendant's Motion to Suppress Physical
Evidence (#21), filed on June 1, 2008; and Defendant's Reply Memorandum for Motion to Suppress
Evidence (#22), filed on June 9, 2008.

        On June 20, 2008, the Court entered an order partially granting Defendant's Request for a *Franks*
Evidentiary Hearing.  *See Order (#23).*  In response to that order, the Government filed its Motion to
Reconsider and Vacate Hearing (#31) on July 21, 2008, and the Defendant filed his Opposition to the
Government's Motion to Reconsider (#33) on August 4, 2008.   Defendant thereafter filed his Motion to
Reconsider Motion to Suppress Evidence (#41) on September 12, 2008; the Government filed its
Response to Defendant's Motion to Reconsider His Motion to Suppress Physical Evidence (#44) on
October 10, 2008; and the Defendant filed his Reply (#47) on October 22, 2008.

         Defendant filed his Second Motion To Suppress Evidence (#52) on November 26, 2008 in
which he moves to suppress his statements based on the alleged violation of his *Miranda* rights.  The

1   Government filed its Opposition to Defendant's Motion to Suppress His Statement (#54) on December

2   9, 2008.

3        Following oral argument at the hearing on January 12, 2009, the Court denied both motions for

4   reconsideration, (#31) and (#41).  The Court then conducted a *Franks* evidentiary hearing in accordance

5   with Order (#23) and an evidentiary hearing on Defendant's Second Motion To Suppress Evidence

6   (#52).  Defendant's counsel requested leave to submit post-hearing briefs which was granted by the

7   Court.   Defendant's Post-Hearing Memorandum in Support of Motion to Suppress Evidence (#61) was

8   filed on February 11, 2009.  The Government's Response to Defendant's Post-Hearing Memorandum

9   (#64) was filed on February 24, 2009.

10                   **FACTUAL BACKGROUND**

11        Defendant Judah May is charged in a one count Indictment filed on January 16, 2008 with

12   possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  This indictment arises out

13   of a search of Defendant's residence on August 8, 2008 which allegedly resulted in the discovery of

14   child pornography.

15       **1.**    **Search Warrant Affidavit:**

16        On August 2, 2006, the Government applied to the undersigned United States Magistrate Judge

17   for a warrant to search the premises at 2680 Mercy Drive, Las Vegas, Nevada and any computers located

18   therein for evidence of child pornography as defined in 18 U.S.C. § 2256.  *See Government's Response*

19   *to Defendant's Motion to Suppress (#21) (copy of Affidavit for search warrant attached).*  In the

20   Affidavit in support of the search warrant, FBI Special Agent Gene M. Tierney stated that on March 15,

21   2006, the San Francisco Division of the FBI identified multiple suspected child pornography websites

22   being hosted outside the United States.  The FBI determined that these websites accepted payment with

23   the online currency "e-gold."  The websites were titled "Sick Child's Room," "Real Lola,"  "Home

24   Collection," and "Children's Dreams" and accepted subscription payments to e-gold accounts 29794916,

25   2981290, 2973774 and 2974856, respectively.  *Affidavit*, ¶ 25.

26        The Affidavit stated that e-gold is an electronic currency system that enables clients to transfer

27   funds globally via the Internet and operates without regard to currency type.  The system equates

28   currency to gold and enables clients to conduct transactions using a single international currency.  *Id.,* ¶

26.  On March 17, 2006, e-gold responded to an administrative subpoena for information on e-gold accounts 29794916, 2981290, 2973774 and 2974856.  E-gold provided subscriber information for those accounts as well as a transaction log detailing individuals who made payments to those accounts.  The transaction log included dates, times, internet protocol (IP) addresses, transaction amounts and a memo section indicative of purchases of child pornography.  *Id.,* ¶ 27.  According to the Affidavit, e-gold provided over 800 records of transactions with the referenced accounts dating back to June 2005.  The Affidavit indicated that because most internet service providers (ISPs) do not maintain IP logging information for more than a few months, the FBI agents narrowed the list to approximately 100 records dating back to January, 2006.  The Affidavit indicated that through further investigation, including the issuance of subpoenas, the FBI identified 22 individuals residing in the United States who had made payments to e-gold accounts  29794916, 2981290, 2973774 and 2974856.  *Id.,* ¶ 28.

The Affidavit then stated that the memo field received from e-gold for all of the 22 identified individuals referred to a website or websites indicative of child pornography, including "Mixed Lolitas," "Magic Lolita," "Spycam Lolita," and "KiDZ Index."  *Id.*, ¶ 29.  According to the Affidavit, FBI agents searched for and located the "Mixed Lolitas," "Magic Lolita," "Spycam Lolita," and "KiDZ Index" websites all of which contained images of child pornography or child erotica on the "Join" or "Home" page.  These websites were also located outside the United States and were still in operation at the time of the Affidavit.  *Id.*, ¶ 30.

Agent Tierney reviewed a Compact Disc (CD) that contained account information and a screen capture of the respective Home pages of the  "Mixed Lolitas," "Magic Lolita," "Spycam Lolita," and "KiDZ Index" websites.  The CD and subpoenaed information showed that e-gold account number 2441036 contained information provided to e-gold by the subscriber and that this e-gold account was subscribed to by Pat May of 2680 Mercy Drive, Las Vegas, Nevada.  *Id.*, ¶¶ 31-32.  Further review of the account and subpoenaed information showed that account number 2441036 was subscribed to on February 11, 2006 at 4:17 a.m. (Eastern Standard Time) and that the subscription amount was forty dollars for a membership purchase for  "KiDZ Index".  The IP address used for this transaction was 70.180.242.60 which investigation revealed used Cox Communications as its ISP.  Agent Tierney further stated that it could not be determined from the records whether the subscription was a new purchase or a

1   renewal of an existing account because e-gold does not maintain records in a fashion to indicate such

2   information. *Id.*, ¶ 32.

3         Agent Tierney testified that he reviewed the screen capture of the Home page of the "KiDZ

4   Index" website which revealed the following:

> [T]he bottom section of the "Home" page contains the images of seven
> minor females, featuring only their faces and heads. The middle section of
> the "Home" page contains images of six pre-pubescent females, all of
> whom are nude. Three of these females are posed in a manner consistent
> with child pornography in that there is a lewd and lascivious display of
> their genitalia. Two of these prepubescent females are sitting with their
> knees pulled up to their chests. Their legs are spread to reveal their
> vaginas. The third pre-pubescent female is squatting with her legs spread
> to reveal her vagina.

10  *Id.*, ¶ 33. The screen capture of the "KiDZ Index" Home page was provided to the Court with the

11  Affidavit. *Id.*

12        The Affidavit also quoted the text of the "KiDZ Index" website Home page as follows:

> "Young pretty girls are willing to play all sorts of games. They surely
> need a helping hand! Come and give them one!" "We offer EXCLUSIVE
> Images and videos of all-time best lolita beauties online sale! Best lola
> photographers have joined their efforts to create the collection of Images
> completely of a different level! You can buy them on this site. All
> material are exclusive.". "New unique collection that contains thousands
> of exclusive uncensored lolita images can grant you perhaps the best
> pleasure of your lifetime." "All the Images are uncensored and were made
> with parental permission".

18  *Id.*, ¶ 34.

19        The Affidavit stated that the FBI subpoenaed Cox Communications for subscriber information

20  for several IP addresses including IP address 70.180.242.60. Cox Communications responded to the

21  subpoena on April 24, 2006 and advised that account information for IP address 70.180.242.60 on

22  February 11, 2006 at 4:17 a.m. (EST) belonged to Judah May of 2680 Mercy Drive, Las Vegas, Nevada

23  89156-4975. As discussed in the next section, the Affidavit also contained information regarding Mr.

24  May's prior criminal history. Based on the information contained in the Affidavit, the Court issued a

25  search warrant on August 2, 2006 which authorized the Government to search the premises at 2680

26  Mercy Drive, Las Vegas, Nevada and any computers located therein for evidence of child pornography.

27  . . .

28  . . .

4

### 2.    Misstatements or Omissions in Search Warrant Affidavit Regarding Defendant's Prior Criminal Record:

In his August 2, 2006 Affidavit in support of the search warrant, Agent Tierney stated:

> 37.    On June 28, 2006, investigation determined that there was a listing for a Judah Patrick May in SCOPE (Shared Computer Operations for Protection and Enforcement), a Nevada criminal data base.  The SCOPE listing showed May residing at 2680 Mercy Drive, Las Vegas, Nevada 89115.  The SCOPE listing also reveals that May is a four time registered sex offender for Sexual Abuse.

> 38.    Further investigation in NCIC revealed that May is a four time registered, Tier One, sex offender out of the State of Oregon.  May is registered for three counts of Sexual Abuse and one count Sodomy.

Agent Tierney testified that at the time he prepared and executed the Affidavit, he believed that the foregoing information was true.  Prior to preparing the Affidavit, he reviewed  NCIC and SCOPE information regarding Mr. May's prior criminal history.  *See Government's Exhibits "1" and "2".*  He looked at the NCIC criminal history for Mr. May which indicated that in 1989 he was charged in Oregon with three counts of sexual abuse and one count of sodomy.  Agent Tierney then looked at the June 28, 2006 SCOPE print out and noted what he believed to be four separate sexual abuse counts for which Mr. May was registered.  Agent Tierney testified that he mistakenly failed to notice that the SCOPE information actually showed that Mr. May registered with the Las Vegas Metropolitan Police Department on February 11, 1991 for what appeared to be two sex abuse felonies.  He thereafter registered with the North Las Vegas Police Department on October 2, 1991 for presumably the same two felonies.  The SCOPE print out also stated that Mr. May was a "TIER RATED LEVEL 1-- SEX OFFENDER."  Agent Tierney testified that based on his misreading of the SCOPE printout, combined with the information he obtained from NCIC, he believed that May was a registered sex offender on four felony sex offenses.

Agent Tierney testified that after the search warrant was issued and the search was conducted, he requested and obtained a certified copy of Mr. May's Oregon judgment of conviction.  The information obtained by the FBI from Josephine County, Oregon Court Clerk on or about August 9, 2006 showed that while Mr. May had been charged in 1989 with one count of Attempted Sexual Abuse I, two counts of Sodomy I and two counts of Sexual Abuse I, all but one count of Sexual Abuse I were dismissed.  The

1   judgment stated that Mr. May pled guilty to one count of Sexual Abuse I for which he was sentenced to

2   four months in jail.  His sentence was suspended and he was placed on five years probation.

3   *Government's Exhibit "1"*.

   **3.    Execution of the Search Warrant and Agents' Interview With
           Defendant:**

6       Agent Tierney testified that nine FBI agents, including inventory personnel, executed the search

7   warrant at Defendant's house.  Agent Tierney knocked on the door and announced the agents' presence.

8   When there was no response, he again knocked and announced the agents' presence.  When still no one

9   answered the door, the agents used a battering ram to open the door.   The agents were wearing vests

10  which identified them as FBI agents.  The agents were also armed with handguns.  Agent Tierney

11  testified that he had his firearm drawn as he entered the house.  He does not recall whether the other

12  agents had weapons drawn, but it would have been standard procedure for them to draw their weapons as

13  they made entry into the premises.  Upon entering the house, Agent Tierney announced that the agents

14  were FBI and were executing a search warrant.  He testified that other agents found Mr. May in a

15  bedroom that had been converted into a computer room and which was located to the left side of the

16  front entrance.

17      Agent Tierney testified that Mr. May was initially placed in handcuffs while the agents secured

18  the premises.  Once it was determined that no other persons were in the residence, the handcuffs were

19  removed.  Mr May was then told to sit on a couch in the living room area and that he should not move

20  from that area without the permission of the agent who was standing near him.  Agent Tierney testified

21  that he handed Mr. May a copy of the search warrant and the list of the items to be seized.  Mr. May

22  reviewed the warrant.  Agent Tierney testified that, at this point, he was still wearing his FBI vest.  He

23  also stated that the agents' holstered firearms and ammunition magazines would have been visible on

24  their belts.  Once the premises were secured, however, the agents left the house in groups of two to three

25  to remove their "raid vests" and to put on shirts that covered their weapons and magazines.  Agent

26  Tierney stated that he was one of the last agents to leave the house to make this apparel change.

27      Agent Tierney testified that after he changed into a "cover shirt," he returned to Mr. May.  FBI

28  agent Sue Flaherty, who was also wearing a "cover shirt," was present when Agent Tierney spoke to Mr.

6

May.  Most of the other agents were in the computer room or other areas of the house looking for

anything of evidentiary value.  Agent Tierney testified that he told Mr. May why the agents were there,

that Mr. May did not have to speak to the agents, but that if he wanted to, Agent Tierney would be happy

to speak with him.  Agent Tierney testified that he also told Mr. May that he was free to leave and that

he was not under arrest.  He also told Mr. May that if he remained in the house during the search, that he

should stay seated where the agents asked him to sit.  This was done as a security measure for the safety

of the agents and Defendant, and for preservation of the evidence.

Agent Tierney testified that Mr. May stated that he would like to talk to the agents about why

they were there.  Agent Tierney, Agent Flaherty and Mr. May then sat at the table located in the kitchen

area.  The interview lasted approximately 20 minutes.  Agent Tierney testified that while he and Agent

Flaherty were talking with Defendant May, other agents passed by the area.  Neither he nor Agent

Flaherty blocked Mr. May's ability to get up and walk out the front door if he had chosen to do so.  Mr.

May answered the agent's questions until he stated that it would be in his best interests to speak to a

lawyer.  At that point, all further questioning ceased.  Agent Tierney stated that he may have thereafter

engaged in some "small talk" with Defendant, but there was no further discussion relating to the case.

Agent Tierney testified that during the interview everyone spoke in a conversational tone.  When asked

if the conversational tone was "friendly," Agent Tierney responded that "it certainly wasn't unfriendly."

After the interview ended, Agent Tierney asked Mr. May to sit on the couch in the living room

area until the agents completed their search.  He advised Mr. May that he would receive a list of all items

seized at the conclusion of the search.  He also told Mr. May that if he needed to get up to use the

bathroom or to get something else that he ask an agent before he did so.  Agent Tierney testified that the

entire search lasted an hour and one half to an hour and forty-five minutes.  Mr. May was not arrested

that day.

On cross-examination, Agent Tierney acknowledged that while he and Agent Flaherty were

interviewing Mr. May, other agents placed evidence in bags on the kitchen table.  After the evidence was

placed in bags, the agents took the bags out of the house.  Agent Tierney acknowledged that Mr. May

was not given the *Miranda* warnings.  He was not told of his right to remain silent, that anything he said

could be used against him and that he had the right to speak with an attorney prior to any questioning.

7

1   Agent Tierney testified that he did not give *Miranda* warnings because Mr. May was not under arrest or

2   in custody.

3        The Defendant called FBI Agent Sue Flaherty as a witness.  Agent Flaherty testified that upon

4   approaching the front door of  Mr. May's residence, the lead FBI agents knocked on the door and

5   announced that they were there to execute a search warrant.  After no one responded to the second knock

6   and announcement, the Agents made a forcible entry.  Agent Flaherty was not at the head of the line of

7   agents and did not recall if a battering ram was used to open the door.  She stated that as the agents

8   entered the house, the lead agent(s) again announced that they were FBI and were executing a search

9   warrant.  Agent Flaherty confirmed that the agents were wearing bullet proof  "FBI" vests and had their

10  weapons drawn.  She testified that Mr. May came around the corner of a hallway that was to the left side

11  of the front door as the agents entered.  She did not recall if Mr. May raised his hands.  Agent Flaherty

12  proceeded to the right toward the kitchen area.  She believed that Defendant May was physically

13  searched when the agents entered the house and were securing the premises.  Agent Flaherty initially

14  testified that she first recalled seeing Mr. May seated at the kitchen table.  On cross-examination by the

15  Government's counsel, however, she recalled that she first observed Defendant in the living room at

16  which time he was in handcuffs.  She testified that the handcuffs were removed once the premises were

17  secured.  Agent Flaherty testified that the agents advised Mr. May of their desire that he not move from

18  the area where he was seated without the permission of the agents.  She also stated that the agents

19  removed their vests and put on cover shirts once Mr. May and the residence were secured.

20       Agent Flaherty testified that she and Agent Tierney then sat at the kitchen table with Mr. May.

21  The table was rectangular and Mr. May was seated at the head of the table near the garage door.  *See*

22  *Defendant's Hearing Exhibit "G"*.  She stated that she would have been closer to the front door than Mr.

23  May.  Mr. May, however,  could have walked around either side of the table to reach the front door.

24  Agent Flaherty stated that the other agents were searching other parts of the house.  The agents may have

25  been able to hear Agent Tierney's discussion with Mr. May as they passed by.   The agents, however, did

26  not stand or sit nearby while Mr. May was interviewed.

27       Agent Flaherty testified that Mr. May was not informed of his *Miranda* rights.  Mr. May was

28  advised, however, that he was not under arrest and that he was free to go.  Mr. May was also told that he

did not have to speak to the agents.  Agent Flaherty testified that Agent Tierney then asked Mr. May questions while the three of them sat at the kitchen table.  She and Agent Tierney sat on the same side of the table.  She testified that Mr. May's path to the garage door or front door was not blocked by the agents.  Agent Flaherty recalled that evidence seized by the agents was bagged in the living room area of the residence.  Agent Flaherty testified that the search probably took about 2 hours and that the interview, which lasted 15-20 minutes, occurred near the beginning of the search.  Agent Flaherty described the interview with Defendant as "a very calm dialogue."  It ended when Mr. May stated that he thought he should speak with a lawyer.  Agent Flaherty indicated that Mr. May remained at the kitchen table after the interview ended.  She later testified, however, that he may have moved to a couch in the living room area.  She recalled that Mr. May stated at some point during the search that he wished to remain in the house during the search.

Defendant May also testified at the hearing.  He stated that he heard the agents knock on the door and yell "FBI".  He went back toward his bedroom and then heard the door bust open.  The agents again yelled "FBI" as they entered the house and they asked "where are you?"  Mr. May testified that he came into the hallway by his bedroom and stated "right here."  The agents pointed their guns at him.  He put his hands up and the agents frisked him.  Agent Tierney told him to go into the living room and sit on the couch and stay there.  Mr. May indicated that he was initially placed in handcuffs, but the handcuffs were removed after the agents secured the house.  Defendant testified that he sat on the couch for approximately an hour while the agents searched the house.  There was one agent in the living room area guarding him.  During this time, he observed the agents put items in bags at the kitchen table and then take them outside.

After an hour, Agent Tierney had Defendant May move to the kitchen table.  According to Mr. May, the table was located along the front wall that separated the kitchen from the  garage.  He testified that Agent Tierney sat at the head of the table on the side of the kitchen closest to the garage door.  He sat next to Agent Tierney.  *See Defendant's Hearing Exhibit "G".*  He testified that another older male agent sat at the opposite end of the table.  He recalled that this agent was writing.  Defendant testified that Agent Flaherty did not sit at the table during the interview.  Although he recalled two female agents being present during the search, he did not specifically recall Agent Flaherty as one of these two agents.

Defendant testified that while he was at the kitchen table, he observed three other agents standing between the kitchen and the living room area.  He did not observe these agents throughout the interview.  Nor did he know what they were doing.  Defendant marked the location of these agents as X2, X3 and X4 on Defendant's Hearing Exhibit "G."

Mr. May testified that prior to beginning the interview, Agent Tierney told him "this is your chance to come clean."  He testified that Agent Tierney did not inform him of his right to remain silent or that anything he said could be used against him.  Nor was he informed of his right to consult with an attorney prior to questioning.  Mr. May testified that Agent Tierney questioned him for approximately a half hour.  Mr. May testified that he did not feel he was free to leave the house at any point during the search, including during the interview.  He also testified that he thought he was being arrested.

On cross examination, Mr. May also testified that he did not recall the agents telling him that they had a search warrant until the search ended.  Mr. May testified that Agent Tierney told him at the end of the interview that he would not be arrested, but did not tell him this before the interview began.  Mr. May also testified that Agent Tierney never told him that he was not required to speak with the agents or that he could stop talking if he wanted to.  Mr. May confirmed that at some point during the interview he stated that he believed he should speak with an attorney.  After he made that statement, no further questions were asked and the interview ended.

## DISCUSSION

### A.   Whether the Affidavit Contained Material Misrepresentations or Omissions Requiring Suppression of the Seized Evidence.

The Court first considers whether the evidence seized or obtained pursuant to the search warrant, including the statements made by Defendant May to the FBI agents, should be suppressed because of intentional or reckless misstatements or omissions of fact in the search warrant affidavit.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that the Fourth Amendment entitles a defendant to challenge the constitutional validity of a search warrant if the defendant makes a substantial preliminary showing that (1) the affidavit in support of the warrant contains intentionally or recklessly false statements and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause.  *See United States v. Martinez-Garcia*,

10

1   397 F.3d 1205, 1215 (9th Cir. 2005), *citing United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir.

2   2000).  To justify an evidentiary hearing, the defendant is required to make a substantial preliminary

3   showing that the affidavit contains intentionally or recklessly false statements and that probable cause to

4   support the issuance of the warrant would not have existed without the false statements.  *Franks,* 438

5   U.S. at 171-172.  If a hearing is granted, the defendant has the burden of proving by a preponderance of

6   the evidence that the false statements were deliberately made or were made with a reckless disregard for

7   the truth.  *United States v. DeLeon*, 955 F.2d 1346, 1348 (9th Cir. 1992).

8          Intentional or reckless omissions may also provide grounds for a *Franks* hearing.  *United States*

9   *v. Jawara*, 474 F.3d 565 (9th Cir. 2007) states in this regard as follows:

10          "A search warrant, to be valid, must be supported by an affidavit
          establishing probable cause." *United States v. Stanert,* 762 F.2d 775, 778
11          (9th Cir.1985).   In *Stanert,* we applied the rationale of *Franks v.*
          *Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to hold
12          that a defendant could challenge a facially valid affidavit by making a
          substantial preliminary showing that "the affiant intentionally or recklessly
13          omitted facts required to prevent technically true statements in the
          affidavit from being misleading."  *Stanert,* 762 F.2d at 781 ("By reporting
14          less than the total story, an affiant can manipulate the inferences a
          magistrate will draw.   To allow a magistrate to be misled in such a
15          manner could denude the probable cause requirement of all real
          meaning.")   In addition, the defendant must show that the "affidavit, once
16          corrected and supplemented," would not "provide ... a substantial basis for
          concluding that probable cause existed" to search defendant's residence.
17          *Id.* at 782.

18          *United States v. Stanert,* 762 F.2d at 781, also states that in determining whether a defendant is

19   entitled to an evidentiary hearing, "[c]lear proof of deliberate or reckless omission is not required.  *See*

20   *United States v. Chesner*, 678 F.2d 1353, 1362 (9th Cir. 1982).  Such proof is reserved for the

21   evidentiary hearing."  *See also United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005).

22   The Seventh Circuit has stated that Defendant "must offer direct evidence of the affiant's state of mind

23   or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate

24   falsehood or reckless disregard."  *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003).

25   Deliberate intent to deceive or reckless disregard for the truth can be inferred from the omission of

26   material facts that would have negated probable cause.  The "omission rule," however, does not require

27   that the affidavit provide general information about every possible theory that would controvert the

28   affiant's good faith assertion of probable cause.  *United States v. Craighead*, 539 F.3d 1073, 1081 (9th

Cir. 2008).

Probable cause means a "fair probability" that contraband or evidence is located in a particular place.   Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a "commonsense, practical question."   Neither certainty nor a preponderance of the evidence is required.  *United States v. Kelley*, 482 F.3d 1047, 1050-51 (9th Cir. 2007), citing *Illinois v. Gates,* 462 U.S. 213, 246,  103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and *United States v. Gourde,* 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc).  In *United States v. Gourde*, the FBI identified a website which contained images of partially dressed girls, some prepubescent, and text which invited viewers to become members of the website.  An undercover agent joined the website, which provided members with the ability to download images directly from the website.  The FBI also determined that defendant had purchased a monthly membership and was a member of the website for two months until it was shut down by the FBI.  In holding that there was probable cause to support the search warrant, the court stated that there was clear and unequivocal evidence that the website was a child pornography site.  The evidence also provided an inference that defendant desired access to the images on the website based on his subscription to the website for over two months.  These facts supported a "fair probability" that the defendant had downloaded images of child pornography which would be found during a search of his computer.  The court distinguished these facts from circumstances where an individual encounters a pornographic website while searching on the Internet, but takes no affirmative action to become a member, or even where an individual becomes a member of the website, but promptly cancels his membership. *Gourde*, 440 F.3d at 1070.  The court noted that other circuits have reached the same conclusion in cases involving nearly identical facts.  *Id.* at 1071, citing *United States v. Martin*, 426 F.3d 68, 75 (2d Cir. 2005) and *United States v. Froman*, 355 F.3d 882, 890-91 (5th Cir. 2004).

       **1.**     **Alleged Misrepresentations or Omissions In Affidavit Regarding "KiDZ Index" Website.**

The Affidavit in this case stated that the FBI's investigation initially revealed that four suspected child pornography websites accepted subscription payments to e-gold accounts 29794916, 2981290, 2973774 and 2974856.  The account information provided by e-gold in response to an administrative

12

subpoena for these four e-gold account numbers, led the Government to the identification of 22

individuals in the United States who had made payments to the four listed e-gold account numbers and

whose transaction records referred to other websites indicative of child pornography, including "Mixed

Lolitas," "Magic Lolita," "Spycam Lolita," and "Kidz Index." *See* ¶ 29. FBI agents confirmed that

these websites contained images of child pornography or child erotica on their "Join" or "Home" pages.

The Affidavit did not indicate whether Defendant May was one of the 22 individuals in the United States

who had made payments to the four listed e-gold account numbers. The Affidavit stated, however, that

the records obtained from e-gold showed that e-gold account number 2441036 was subscribed to by Pat

May of 2680 Mercy Drive, Las Vegas, Nevada. *Id.*, ¶¶ 31-32. Further review of this account

information showed that on February 11, 2006 at 4:17 a.m. (Eastern Standard Time) account number

2441036 was used to purchase a forty dollar membership fee for "KiDZ Index". The IP address used

for this transaction was 70.180.242.60 which investigation showed belonged to Defendant Judah May at

the time the forty dollar subscription to "KiDZ Index" was purchased.

Defendant May's Motion to Suppress (#20) argued that the affidavit was misleading because

there were and are possibly hundreds of legitimate websites with the word "kidz" in the name, title or

content of the website and that there are scores of such websites which allow individuals to purchase

memberships, services or products. *Motion to Suppress (#20)*, p. 4. Defendant also argued that the word

"index" is not unique in the English language or on the Internet. In support of this argument, Defendant

provided an affidavit by his computer and Internet technology expert, Adrian Leon Mare, who stated that

an Internet search using the terms "kidz" and "index" yielded hundreds of hits on websites, including

websites which sell various products such as children's clothing, toys, etc. Mr. Mare's affidavit,

however, did not indicate that he performed an Internet search of the term "KiDZ Index" or, if he did,

what the result of such a search revealed.

In Order (#23), the Court held that Defendant had not made a substantial preliminary showing

sufficient to warrant a *Franks* hearing based on the omission of information regarding the number of

other websites that use the words "kidz" or "index" in their titles. The inclusion of this information in

the affidavit would not have been sufficient to defeat a finding of probable cause and therefore did not

support an inference that the Government intentionally or recklessly omitted the information. In his

1   Motion to Reconsider (#41), Defendant argued that there was additional information, not presented in

2   the motion to suppress, which showed that there is more than one internet website that uses the term or

3   phrase "kidz index" and that if this information had been included in the affidavit, there would not have

4   been probable cause.  In its response, the Government argued that at the time the search warrant was

5   issued, only two internet sites existed which included the both the words "kidz" and "index" in their

6   titles.  Of those two sites, one was a "search engine," rather than an actual website, and did not have any

7   type of membership associated with it.  The other was the "KiDZ Index" website that contained child

8   pornographic images.

9        The law of the case doctrine provides that the court will generally not reexamine an issue

10  previously decided by the same or higher court in the same case.  *United States v. Cuddy*, 147 F.3d 1111,

11  1114 (9th Cir.1998), *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).  The court has the

12  discretion to depart from the law of case when (1) the first decision was clearly erroneous, (2) there has

13  been an intervening change of law, (3) the evidence on remand is substantially different, (4) other

14  changed circumstances exist, or (5) a manifest injustice would otherwise result.  *Cuddy*, 147 F.3d at

15  1114.  Defendant's motion for reconsideration failed to demonstrate that the additional information

16  described in that motion could not have been presented in support of Defendant's initial motion to

17  suppress.  Defendant also offered nothing to rebut the Government's assertion that at the time Defendant

18  purchased the subscription to the "KiDZ Index" website, the only other Internet site using this title was a

19  search engine that did not offer a membership.  The additional information, at most, raised a remote

20  possibility that Defendant did not purchase a subscription to the "KiDZ Index" website containing child

21  pornographic images.  The failure to discuss such possibilities in the affidavit did not provide grounds

22  for a *Franks* evidentiary hearing.  *United States v. Craighead*, 539 F.3d at 1081.  Accordingly, the Court

23  reaffirms its oral decision at the January 12th hearing denying Defendant's Motion to Reconsider (#41).

24        **2.   Alleged Misrepresentations Regarding Defendant's Criminal Record.**

25        Defendant's Motion to Suppress (#20) also argued that the Affidavit contained false and

26  misleading information which distorted and exaggerated Defendant's prior criminal history in order to

27  portray him as an active sexual predator and to induce the Court to issue a search warrant not otherwise

28  supported by probable cause.   In granting an evidentiary hearing as to this allegation, the Court noted

14

1    that the inference that Defendant May had downloaded child pornography from the "KiDZ Index"

2    website was strengthened by the information in the affidavit concerning his prior criminal record as a sex

3    offender.  As the dissenting opinion in *United States v. Gourde* noted, the circuit decisions cited by the

4    majority opinion in that case relied on information about the suspect's prior criminal record or his

5    pronounced interest in child pornography in concluding that the search warrant affidavit was supported

6    by probable cause.  *Gourde*, 440 F.3d at 1084, citing *United States v. Martin*, 426 F.3d 68, 75 (2d Cir.

7    2005); *United States v. Froman*, 355 F.3d 882, 890-91 (5th Cir. 2004).  *See also United States v. Moyer*,

8    256 Fed.Appx 61, 62 (9th Cir. 2007) (holding that defendant's prior conviction for distributing child

9    pornography was one factor that supported probable cause finding).

10           In regard to the information about Defendant May's criminal history, this Court stated:

11                   It is arguable that probable cause would still exist, based on the totality of
                     the circumstances, even if Defendant's prior record as a sex offender was
12                   substantially less significant than that represented in the Affidavit.  The
                     issue would be substantially closer, however, and one on which judges
13                   could reasonably disagree.  The Court therefore finds that the interests of
                     justice and judicial economy are better served in this case if the Court
14                   conducts a *Franks* evidentiary hearing to determine whether the Affidavit
                     misrepresented the Defendant's prior criminal history and, if so, whether
15                   Agent Tierney intentionally or recklessly misstated Defendant May's prior
                     record.  If the Court finds that the information regarding Defendant's prior
16                   criminal record was accurate or was not intentionally or recklessly
                     misstated in the Affidavit, then the Court will recommend that
17                   Defendant's Motion to Suppress (#20) be denied.

18   *Order (#23)*, p. 11.

19           Based on the testimony and evidence presented at the hearing, it is clear that the Affidavit was

20   inaccurate regarding Defendant's prior criminal history.  The Affidavit stated that Mr. May was a four

21   time registered sex offender, Tier One, from the State of Oregon and that he was registered for three

22   counts of Sexual Abuse and one count of Sodomy.  The SCOPE information available to Agent Tierney

23   indicated that Mr. May was at most a registered sex offender on two charges of sexual abuse.  SCOPE

24   also indicated that Mr. May was a Tier One sex offender.  The Affidavit was accurate in that respect.

25   The NCIC information, however, did not contain any information regarding convictions.  Rather, it

26   indicated that Mr. May had been charged with three counts of sexual abuse and one count of sodomy in

27   Oregon in 1989.  The NCIC information stated that the disposition of the charges was unknown.

28

1    *Government's Exhibit "1".*[1]  Agent Tierney's Affidavit also omitted the fact that these charges occurred

2    in 1989 or 1990 and that Mr. May had registered as a sex offender in 1991.

3           Subsequent to the execution of the search warrant, Agent Tierney learned on or about August 9-

4    10, 2006 that Mr. May had been convicted, pursuant to a guilty plea, of only one count of sexual abuse.

5    There is no evidence that Mr. Tierney was aware of this information prior to August 2, 2006, although

6    he probably could have obtained accurate information about Defendant's criminal record for inclusion in

7    the Affidavit if he believed it was relevant to the probable cause determination.

8           The issue under *Franks* is whether Agent Tierney's misstatements or omissions regarding Mr.

9    May's prior criminal record were intentionally or recklessly made.  *Black's Law Dictionary (8th Ed.)*

10   defines "recklessness" as:

11            **1.** Conduct whereby the actor does not desire harmful consequence but
              nonetheless foresees the possibility and consciously takes the risk.

12            Recklessness involves a greater degree of fault than negligence but a lesser
              degree of fault than intentional wrongdoing.  **2.** The state of mind in which

13            a person does not care about the consequences of his or her actions.  --
              Also termed *heedlessness.*

14

15          Having observed Agent Tierney's demeanor and credibility as a witness, the Court accepts his

16   testimony that he did not intend to mislead the Court by providing false information about Mr. May's

17   prior criminal record.  Agent Tierney was clearly negligent, at minimum, in making the inaccurate

18   statements in the Affidavit regarding Defendant May's prior criminal record.  A reasonably careful

19   reading of the SCOPE information indicated that Mr. May was, at most, a two time registered sex

20   offender.  Based on his misreading of the SCOPE information, Agent Tierney apparently assumed that

21   Defendant May had been convicted on the four charges referenced in the NCIC information even though

22   NCIC stated that the disposition of those charges was unknown.

23          While it is not always easy to distinguish between gross negligence and recklessness, in the

24   Court's view it was reckless for Agent Tierney, an experienced FBI agent, to represent in his sworn

25   Affidavit that "[f]urther investigation in NCIC revealed that May is a four time registered, Tier One, sex

26

27          ───────────────

28          [1]The NCIC information in *Exhibit "1"* was printed in July 2008.  The Court assumes that this printout contains the same information that Agent Tierney reviewed in July 2006.

16

1  offender out of the State of Oregon.  May is registered for three counts of Sexual Abuse and one count

2  Sodomy."   At the time he made this statement, Agent Tierney did not have a reasonable factual basis for

3  believing that it was true.  He had not verified through NCIC or anywhere else that Mr. May was, in fact,

4  a four time registered sex offender.  Agent Tierney also omitted the information that the charges

5  occurred in 1989 or 1990, more than 15 years prior to the alleged conduct described in the Affidavit.

6  Because such a significant time period had passed between Defendant's prior criminal charges or

7  convictions and the conduct alleged in the Affidavit, Agent Tierney should have known that this was

8  material to the weight that the Court would or should give to Defendant's criminal record. The Court

9  therefore concludes that the false statements and omissions in paragraphs 37 and 38 of the Agent

10  Tierney's Affidavit were recklessly made.

11      Having concluded that the affidavit contained recklessly false statements or omissions about

12  Defendant May's criminal record, the Court must now decide whether probable cause would have still

13  existed if accurate information had been included in the Affidavit.  If Agent Tierney had simply provided

14  the Court with an accurate summary of the information contained in the SCOPE and NCIC databases, he

15  would have reported the following:  According to NCIC, Mr. May was charged with three counts of

16  sexual abuse and one count of sodomy in Josephine County, Oregon in 1989, but the disposition of those

17  charges was unknown.  He would have further informed the Court that according to SCOPE, Mr. May

18  had been registered with the Metropolitan Police Department and the North Las Vegas Police

19  Department in 1991 as a registered felon for sex abuse on what appeared to be two counts and that he

20  was listed as a "Tier Rated Level 1-Sex Offender."   If Agent Tierney had gone further and obtained

21  information regarding Mr. May's actual conviction in Oregon before he submitted the Affidavit to the

22  Court, he would have reported that although Mr. May was charged in 1989 with one count of attempted

23  sexual abuse, two counts of sexual abuse I and two counts of sodomy I, he ultimately pled guilty in 1990

24  to one count of sexual abuse I for which he received a suspended four month sentence and was placed on

25  five years probation.

26      As discussed above, the Affidavit provided evidence that Defendant May had purchased a

27  subscription to an Internet website that contained images of child pornography.  Arguably, this

28  information was sufficient alone to support the issuance of the warrant. *United States v. Gourde, supra,*

17

1   (majority en banc opinion).  Although the fact that Defendant's criminal charges and conviction were

2   more than 15 years old, and therefore much less significant than a criminal record involving more recent

3   arrests or convictions for sex related crimes, the Court would still have concluded that there was

4   probable cause to support the issuance of a search warrant based on Mr. May's subscription to a child

5   pornography website and his past criminal history indicating that he had at least some propensity to

6   engage in criminal sexual behavior.  Accordingly, Defendant's Motion to Suppress Evidence (#20)

7   should be denied notwithstanding that Agent Tierney made reckless misstatements or omissions about

8   Defendant's criminal history in the Affidavit.

9      **B.      Whether Defendant Was In Custody and Entitled to *Miranda*
            Warnings Prior to Being Interviewed by The Agents.**

10

11         Under *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602 (1966), a criminal suspect who

12   is in custody must be advised prior to questioning of his right to remain silent, that anything he says may

13   be used against him, that he has the right to the assistance of counsel before and during questioning and

14   to have counsel appointed for him if he cannot afford an attorney.  It is undisputed that Defendant May

15   was not informed of his *Miranda* rights prior to being interviewed by Agent Tierney.  The question is

16   whether Mr. May was in custody such that the agents were required to inform him of his *Miranda* rights.

17         To determine whether an individual was in custody, the court must, after examining all of the

18   circumstances surrounding the interrogation, decide whether there was a formal arrest, or a restraint of

19   the suspect's freedom of movement to the degree associated with a formal arrest.  *United States v.*

20   *Bassignani*, 560 F.3d 989, 993 (9th 2009).  The court has also stated that a suspect is considered  "in

21   custody" for purposes of *Miranda* if he has been deprived of his freedom of movement in any significant

22   way.  *United States v. Craighead*, 539 F.3d 1073, 1082  (9th Cir. 2008), citing *Miranda*, 384 U.S. at 444.

23   The custody determination must be based on the totality of the circumstances surrounding the

24   interrogation.  *Id.,* citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995).  In analyzing

25   the circumstances, the court asks whether a reasonable person in those circumstances "'would have felt

26

27

28

18

1    that he or she was not at liberty to terminate the interrogation and leave.'" *Id.*[2]

2        The Ninth Circuit has identified five factors relevant to the custody determination:  (1) the

3    language used to summon the individual; (2) the extent to which the defendant is confronted with

4    evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention;

5    and (5) the degree of pressure applied to the individual.  *United States v. Bassignani*, 560 F.3d 989, 994

6    (9th 2009), citing *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).  *Bassignani* also states that the

7    defendant has the burden of proving that he was under arrest or in custody for purposes of *Miranda*.  *Id.*,

8    560 F.3d at 993.

9        In *United States v. Craighead*, the court focused specifically on whether an interrogation

10   conducted in a suspect's home was custodial.  The court noted that courts have generally been less likely

11   to find that an interrogation in a suspect's home, as compared to a police station, was custodial because

12   the element of compulsion is less likely to be present where the suspect is in familiar surroundings.  *Id.*,

13   539 F.3d at 1083.  An interrogation in the suspect's home may, however, be found to be custodial where

14   "the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of

15   the home into a 'police dominated' atmosphere."  The determination of whether an in-home

16   interrogation was custodial is fact intensive.  *Craighead* identifies the following non-exhaustive list of

17   factors which are relevant to this particular determination:  (1) the number of law enforcement officers

18   present and whether they were armed; (2) whether the suspect was at any point restrained either by

19   physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the

---

21        [2]The Court recognizes that if law enforcement agents give *Miranda* warnings to a suspect and
22   document his or her waiver of rights in writing, then disputes as to whether the suspect was in custody or
     waived his *Miranda* rights can be avoided.  The Court also recognizes, however, that law enforcement
23   officers, including the FBI agents in this case, may subjectively seek to avoid giving *Miranda* warnings
     to suspects because they believe it discourages the suspect from speaking to them.  The officers or agents
24   therefore take certain steps that avoid a judicial finding that the suspect was in custody.  Whether it is
     good constitutional policy to permit law enforcement officers to sidestep *Miranda* in this manner is not
25   for this Court to decide.  The Supreme Court has limited the requirement for giving *Miranda* warnings to
     suspects who are in custody.  The Ninth Circuit and other circuits have developed multi-factored tests
26   for determining whether an objectively reasonable person in the defendant's position would have
     believed he was in custody, i.e., not free to leave.
27

28

1   suspect was informed that he was free to leave or terminate the interview and the context in which any

2   such statements were made.  These factors overlap to some extent with the more general factors listed in

3   *United States v. Kim, supra.*

4   In *Craighead*, law enforcement officers conducted a search of defendant's home for evidence of

5   child pornography.  During the search, an FBI agent interviewed the defendant in a closed storage room

6   at the back of his house.   In regard to the first factor, the court noted that the presence of a large number

7   of visibly armed law enforcement officers goes a long way toward making the suspect's home a police

8   dominated atmosphere.  *Id.*, 539 F.3d at 1085.  In *Craighead*, eight law enforcement officers from three

9   different agencies entered defendant's residence.  All of them were armed, some wore protective gear

10  and some unholstered their weapons in defendant's presence.  It does not appear, however, that the

11  officers pointed their weapons at the defendant at any time.

12  In regard to the second factor, the court stated that "[w]hen law enforcement agents restrain the

13  ability of the suspect to move  -- particularly through physical restraints, but also through threats or

14  intimidation -- a suspect may reasonably feel he is subject to police domination within his own home and

15  thus not free to leave or terminate the interrogation."  *Id.*  at 1085.  The court also stated that restraint

16  amounting to custody may be inferred where law enforcement officers permit the suspect to move

17  around the house for brief periods but insist on escorting and monitoring him at all times.  *Id.*  The court

18  also noted that while physical control of the suspect may be necessary to preserve evidence and protect

19  the safety of the agents, that does not lessen the tendency of such control to make a reasonable person

20  believe he is in custody.  In this regard, *Craighead* agreed with the First Circuit's decision in *United*

21  *States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) that the government has the option to either

22  postpone the interrogation to a non-custodial moment or provide *Miranda* warnings to the suspect.

23  *Craighead*, at 1086.  In *Craighead*, the defendant was not subjected to physical restraints.  He was,

24  however, escorted to a small storage room for purposes of the interrogation.  Besides the FBI agent who

25  conducted the interview, a police detective was also in the room and stood facing defendant with his

26  back to the closed door.  The court stated in this environment it was objectively reasonable for the

27  defendant to believe he was under guard and not free to leave.  These facts were also relevant to the third

28  factor -- whether the suspect was isolated from others such as family members, friends or others who

1   might provide him moral support and thereby lessen the police dominated atmosphere.

2         In regard to the fourth factor, *Craighead* states that "[i]f a law enforcement officer informs the

3   suspect that he is not under arrest, that statements are voluntary, and that he is free to leave, this

4   communication greatly reduces the chance that a suspect will reasonably believe he is in custody."

5   *Craighead*, 539 F.3d at 1087, citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).  More

6   recently in *Bassignani*, the court stated:

7               We have consistently held that a defendant is not in custody when officers
              tell him that he is not under arrest and is free to leave at any time.  *See*
8               *Crawford*, 372 F.3d at 1060 ("Perhaps most significant for resolving the
              question of custody, Defendant was expressly told that he was not under
9               arrest ...") ;  *Norris*, 428 F.3d at 912 ('[Norris] was told that his
              cooperation was voluntary and that he was free to terminate the interview
10              at any time.  Norris was also told that he was not under arrest and he was
              never restrained in any way.")  Other courts agree.  *See e.g., United States*
11              *v. Leese*, 176 F.3d 740, 744 (3d Cir. 1999) ("Not only was Leese told that
              she was not under arrest before the questioning began, but she was
12              specifically informed that when the questioning was concluded the
              inspectors would be returning to Harrisburg  and she would not be going
13              with them.")

14   560 F.3d at 996-97.[3]

15         *Craighead* states, however, that the mere recitation of such statements to a suspect does not

16   render an interrogation non-custodial *per se.*  The statements must be considered in the context of the

17   scene as a whole.  In *Craighead*, the interviewing FBI agent told defendant that he was not under arrest

18   and was free to leave.  The court, however, accepted as reasonable defendant's testimony that because

19   law enforcement officers from three different agencies were present in his home, he did not believe he

20   could leave unless the other agents and his commanding sergeant also gave their consent.  The court also

21   found that the FBI agent's statement that defendant was free to leave was contradicted by the physical

22   environment in which he was interviewed.  In this connection, the court cited *United States v. Lee*, 699

23   F.2d 466, 467-68 (9th Cir. 1982), in which the court held that an interrogation was custodial even though

24   the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any

25   time.  The defendant in *Lee* was questioned in a closed FBI car for over an hour while police

26

27   ───────────────

28         [3]*Bassignani* involved an interview that took place in defendant's workplace and did not involve
the same type of police dominated atmosphere that the court found in *Craighead*.

21

1   investigators searched his house.  *Craighead* notes that the *Miranda* test for custody does not ask

2   whether the suspect was told he was free to leave, but instead asks whether a reasonable person would

3   have felt that he or she was free to leave.  *Id.*, 539 F.3d at 1088.  The court also noted that "[a]n

4   interview conducted in a suspect's kitchen, living room or bedroom might allow the suspect to take

5   comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police

6   dominated atmosphere."  *Id.*  The custodial physical environment in *Craighead*, however, outweighed

7   any assurance that defendant may have received from the agent's statement that he was free to leave.

8          As *Craighead* states, each case must be decided on its own facts in light of the relevant factors.

9   In this case, nine FBI agents entered Defendant May's residence.  The agents made a forcible entry with

10  a battering ram.  The agents were wearing protective vests and had their guns drawn.  One or more of the

11  agents initially pointed their guns at Defendant.  Defendant was frisked and then placed in handcuffs

12  until the agents completed their sweep of the premises and determined that no one else was present.

13  Defendant was ordered to sit on a couch in the living room and an agent was stationed nearby to guard

14  him.  Defendant was told that he should ask permission to go to the bathroom or to other areas of the

15  house.  Obviously, the circumstances at the beginning of the search created a highly police dominated

16  atmosphere in which a reasonable person in Defendant's position would not have felt he was free to

17  leave.  The issue, therefore, is whether that environment changed, such that Defendant's subsequent

18  interview and statements to the agents should be viewed as non-custodial and voluntary.

19          Agent Tierney testified that once Defendant and the house were secured, the agents left the house

20  in groups of two or three and removed their protective vests and put on "cover shirts" which concealed

21  their holstered weapons and magazines.  According to Agent Tierney, upon returning to the residence, he

22  told Mr. May why the agents were there, that Mr. May did not have to speak to agents, but that if he

23  wanted to, Agent Tierney would be happy to speak with him.  Agent Tierney also testified that he told

24  Mr. May he was free to leave and that he was not under arrest.  He again told Mr. May, however, that if

25  he remained in the house, he should stay seated where the agents asked him to sit and not move without

26  permission.  Agent Flaherty also testified that Mr. May was told that he was not under arrest, that he was

27  free to go and that he did not have to speak with the agents.  Her testimony suggests, but is not clear, that

28  these statements were made to Mr. May once they were seated at the kitchen table.  Both agents

22

1   indicated that Mr. May was willing to speak with Agent Tierney.  The agents also testified that the

2   interview of Mr. May lasted 15 to 20 minutes and took place near the beginning of the search which

3   lasted a total of one and a half to two hours.  The length of the interview in this case does not suggest

4   that Defendant was in custody.  *See Bassignani*, 560 F.3d at 996.

5           Mr. May disputed Agent Tierney's and Agent Flaherty's testimony.  He testified that he remained

6   seated on the couch under guard for approximately an hour before Agent Tierney took him to the kitchen

7   table.  According to Mr. May, Agent Tierney told him "this is your chance to come clean."  He did not

8   recall the agents telling him that they had a search warrant until the search ended.  He also testified that

9   Agent Tierney did not tell him until the end of the interview that he would not be arrested.  Mr. May also

10  testified that Agent Tierney never told him that he was not required to speak to the agents or that he

11  could stop talking if he wanted to.  Although Mr. May testified that there were three agents standing in

12  an area between the kitchen and the living room, and nearer the front door than he was, the agents were

13  not visible to him throughout the interview because he was not facing them.  He also did not know why

14  they were standing where they were.  Mr. May's testimony does not indicate that the agents were

15  positioned in a manner that clearly blocked or obstructed his ability to get up from the table and walk out

16  of the house such as existed in *Craighead.*  According to Mr. May, the interview lasted about 30

17  minutes.

18          Defendant May did not contradict the Agents' testimony that the interview was conducted in a

19  calm manner.  He did not claim that Agent Tierney confronted him with evidence of his alleged guilt or

20  make any statements to pressure him to confess.  Defendant's counsel in fact objected when the

21  Government's counsel attempted to cross-examine Defendant about the substance of the interview.

22  Defendant's counsel stated that although Defendant contends he was in custody during the interview, he

23  does not claim that his interview statements were involuntary.  Because the Defendant has the burden of

24  proof, the Government was not obligated to present evidence that no undue pressure was placed on

25  Defendant during the interview.  The testimony of Agent Tierney and Agent Flaherty, however, indicates

26  that Defendant was not subjected to undue pressure.  Mr. May's testimony that the interview ended when

27  he told Agent Tierney that he believed he should speak with an attorney is also consistent with the

28  conclusion that Defendant was not subjected to pressure during the interview and that he was, in fact,

23

1   free to end it as soon as he thought it in his best interest to do so.

2          Although there was a highly police dominated atmosphere at the beginning of the search, the

3   agents took steps to lessen that atmosphere before Agent Tierney asked Defendant if he would be willing

4   to speak with him.  While guns were initially pointed at Defendant and he was placed in handcuffs, the

5   agents holstered their weapons and removed Defendant's handcuffs as soon as the premises were secure.

6   This appears to have occurred within the first several minutes after the entry was made.  The agents then

7   left the house, removed their FBI protective vests and put on cover shirts which covered over their

8   weapons.  Although Defendant May was presumably still aware that the agents were armed, the visible

9   display of weapons was removed.  Although Agent Tierney told Mr. May that he should remain seated in

10  the living room and not move unless he obtained permission to do so, he was also advised that he did not

11  have to remain in the house.  The interview of Mr. May was also conducted at the kitchen table in

12  circumstances that *Craighead* states tend to decrease the sensation of being isolated in a police

13  dominated atmosphere.

14         None of these measures would have been sufficient to eliminate the police dominated

15  atmosphere and custodial nature of the interrogation *if* Mr. May had not been told that he did not have to

16  speak to agents, that he was free to leave and that he was not under arrest.  The Court finds that Agent

17  Tierney and Agent Flaherty were more credible and believable than Defendant May in their testimony

18  that Mr. May was told prior to the interview that he did not have to speak to agents, that he was free to

19  leave and that he was not under arrest.  The Court therefore accepts the agents' testimony.  As both

20  *Craighead* and *Bassignani* state, the making of such statements greatly reduces the likelihood that a

21  suspect will reasonably believe he is in custody.  Because the Court finds that the agents did make these

22  statements to Mr. May after they had taken other measures to reduce the police dominated atmosphere,

23  the Court concludes, based on the totality of the circumstances, that Defendant May was not in custody

24  during the interview.

25                                    **<u>CONCLUSION</u>**

26         Based on the foregoing, the Court finds that notwithstanding the false statements or omissions in

27  the search warrant affidavit regarding Defendant May's prior criminal record, probable cause would still

28  have existed if accurate information regarding his record had been included in the affidavit.  The Court

1    also finds that Defendant May was not in custody during the interview with Agent Tierney on August 8,

2    2006 and therefore the agents were not required to inform him of his *Miranda* rights.  Accordingly,

### ORDER

4           **IT IS ORDERED** that the United States' Motion to Reconsider and vacate Hearing (#31) and

5    Defendant's Motion to Reconsider Motion to Suppress Evidence (#41) are **denied**.

### RECOMMENDATION

7           **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Franks

8    Hearing Requested to Determine Whether The Application for Search Warrant Was Misleading) (#20)

9    and Defendant Second Motion to Suppress Evidence (#52) be **denied.**

### NOTICE

11          Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

12   writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

13   courts of appeal may determine that an appeal has been waived due to the failure to file objections within

14   the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure

15   to file objections within the specified time and (2) failure to properly address and brief the objectionable

16   issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of

17   the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United*

18   *Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

19          DATED this 8th day of May, 2009.

21                                           GEORGE FOLEY, JR.
                                             United States Magistrate Judge

25